**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**Deidre Gresham,**

      **Plaintiff,**

      **v.**

**Honda Development &**
**Manufacturing of America, LLC,**

      **Defendant.**

**Case No. 2:23-cv-4015**

**Judge Michael H. Watson**

**Magistrate Judge Deavers**

## OPINION AND ORDER

Honda Development & Manufacturing of America, LLC ("Honda") moves

for summary judgment on all claims brought against it by Deidre Gresham

("Plaintiff"). ECF No. 32. The motion is fully briefed and ripe for consideration.

*See* ECF Nos. 35, 36.

For the reasons below, Honda's motion is **GRANTED**.

## I.    STATEMENT OF FACTS

### A.    Plaintiff starts a new position at Honda.

In January 2021, Plaintiff (an African American woman) accepted a full-

time position as a production associate in the Assembly Department at Honda's

Marysville Auto Plant.[1] ECF No. 32-6 at PAGEID # 504; Gresham Dep. 17:16–

20, ECF No. 32-5; ECF No. 35-3 at PAGEID # 658. Plaintiff underwent new-hire

---

[1] Plaintiff originally began her tenure at Honda in 2010 as a contractor. Gresham Dep. 14:7–15:12, ECF No. 32-5. She then worked at American Showa (a company under the Honda umbrella) as a full-time quality inspector for eight to ten years before she was hired at the Marysville Auto Plant. *Id.*

orientation, during which she reviewed and received copies of Honda's policies and procedures. ECF No. 32-6 at PAGEID # 504; Gresham Dep. 73:19–74:5, ECF No. 32-5. Honda also makes its policy manual electronically available to employees. Gresham Dep. 74:6–10, ECF No. 32-5; *see* ECF No. 32-7 (policy manual excerpts).

As relevant here, one such policy that Plaintiff reviewed was Honda's attendance policy. ECF No. 32-7 at PAGEID # 517; Gresham Dep. 89:3–15, ECF No. 32-5. The attendance policy requires 100% attendance for all non-exempt employees, including production associates. ECF No. 32-7 at PAGEID # 517; Gresham Dep. 89:20–90:3, ECF No. 32-5 ("Q. All right. And it does say Honda expects a hundred percent attendance, and that's well known within Honda, isn't it? A. Yes."). If an employee falls below a 99% attendance rate (excluding approved absences), Honda engages in progressive discipline and corrective action. ECF No. 32-7 at PAGEID # 517; *see also id.* at PAGEID # 513 ("Excessive absenteeism and/or patterned absences are prohibited."). Corrective action for attendance violations generally begins with counseling and increases in severity, culminating in separation of employment if attendance is not improved. *Id.* at PAGEID # 517; Gresham Dep. 88:19–90:13, ECF No. 32-5.

**B.      Plaintiff has issues with attendance and coworker interactions.**

During the first month of Plaintiff's employment, her attendance percentage dropped to 88.5%. ECF No. 32-15 at PAGEID # 596. Because she failed to comply with Honda's attendance policy, Plaintiff received Level I discipline

(counseling) for poor attendance in early March 2021. *Id.* Due to her discipline status, she was "ineligible for promotion for 12 months from the date of this counseling," and she could not "transfer until [her] attendance [was] at or above [Honda's] minimum attendance standard of 99%." *Id.*; Gresham Dep. 185:17–186:11, ECF No. 32-5.

Separately, at some point between January and March 2021, one of Plaintiff's co-workers (who was biracial) told other co-workers, including two team leads (who were Hispanic), that Plaintiff did not like white men. Gresham Dep. 102:11–105:18, ECF No. 32-5; ECF No. 35-2 at PAQGEID # 644. Plaintiff also testified that the same co-worker instructed another employee, who was Asian, to stay away from Plaintiff (for a reason unknown to Plaintiff). Gresham Dep. at 105:22–106:18, ECF No. 32-5. Plaintiff did not report these incidents to Honda management or human resources. *Id.* at 107:23–108:17.

Plaintiff's employment continued without incident until February 2022, when she again failed to comply with Honda's attendance policy and was moved to Level II discipline. ECF No. 32-15 at PAGEID # 597. She consequently remained ineligible for promotion or transfer. *Id.*; Gresham Dep. 187:9–24, ECF No. 32-5. Nevertheless, Plaintiff's poor attendance continued, leading to Level III discipline on September 29, 2022. ECF No. 32-15 at PAGEID # 598. At that time, her attendance percentage over the preceding twelve months was 75.6%. *Id.*; Gresham Dep. 188:22–189:3, ECF No. 32-5 ("Q. . . . [Y]our attendance was down to 75 percent. A. Okay. Q. Is that correct? A. Yes."). By virtue of her

Level III status, she was "ineligible to transfer, be promoted, job post [sic], or participate in any special project for 12 months from the date of this counseling." ECF No. 32-15 at PAGEID # 598.

Also during the fall of 2022, Plaintiff reported that a "clique" of three Honda associates—Richard Cunningham (who was African American), an employee named Brandon (who was white), and an employee named either Ernest or Frank (who was African)[2]—were talking about her. Gresham Dep. 54:22–57:18, 63:4–15, 108:18–109:2, 110:5–23, ECF No. 32-5; ECF No. 35-1. Plaintiff reported this to Honda's Compliance and Ethics Department ("C&E"), and her complaint made its way to several Honda management employees, including Heather Harpel, Gary Erwin, and Cheryl Davies.[3] Gresham Dep. at 110:24–111:14; Harpel Aff. ¶¶ 2–3, ECF No. 32-1; Erwin Aff. ¶ 2, ECF No. 32-2; ECF No. 32-10. Ms. Davies dismissed Plaintiff and told her to speak with Mr. Erwin about it.[4] Gresham Dep. 111:23–112:5, ECF No. 32-5. So, Plaintiff met with Mr. Erwin,

---

[2] Plaintiff does not know Brandon's last name and is not certain of whether the third associate (whose last name she also does not know) was named Frank or Ernest. Gresham Dep. 108:18–109:2, ECF No. 32-5.

[3] It is entirely unclear which positions these three management employees held during the relevant time. For instance, Plaintiff testified that Ms. Davies was her "department manager," Gresham Dep. 111:11–14, ECF No. 32-5, but Mr. Erwin stated that Ms. Davies was Plaintiff's team lead, Erwin Aff. ¶ 2, ECF No. 32-2. Nevertheless, each of these three management employees appears to have served in supervisory or superior roles with respect to Plaintiff.

[4] Plaintiff testified that Ms. Davies "never wanted to intervene" because "Brandon was one of her favorites" and because "she was getting ready to retire." Gresham Dep. 111:15–112:8, ECF No. 32-5; see also ECF No. 35-3 at PAGEID # 657.

as well as Ms. Harpel. Erwin Aff. ¶¶ 2, 4, ECF No. 32-2; Harpel Aff. ¶ 4, ECF No. 32-1.

The parties diverge on their accounts of what occurred during Plaintiff's meetings with Mr. Erwin and Ms. Harpel. On one side, Plaintiff testified that she told Mr. Erwin and Ms. Harpel that Brandon and the other two associates were spreading rumors and telling others that Plaintiff was racist, prejudiced, and did not like white people. Gresham Dep. 113:3–114:2, 123:3–8, ECF No. 32-5. Plaintiff believes that Brandon started the rumor because he was jealous of her work productivity and because she had recently filed an "indirect bullying" complaint against him.[5] *Id.* at 117:10–121:2. During her meeting with Ms. Harpel, Plaintiff indicated that she wanted Brandon to attend so that she could ask him about his motivations for spreading the rumors, but Ms. Harpel declined to invite Brandon because she did not want him "to feel cornered." *Id.* at 112:15– 113:2. Plaintiff testified that Ms. Harpel and Mr. Erwin ultimately told her that they "did not want to get involved" and that they "did not really meet with" Plaintiff afterward. *Id.* at 97:1–98:24, 112:15–113:2, 125:18–126:17.

---

[5] The conduct underlying Plaintiff's indirect bullying complaint was an incident on the line when Brandon "snarled" at Plaintiff and gave her a "nasty" stare. Gresham Dep. 117:10–119:7, ECF No. 32-5. Plaintiff spoke to the assistant lead on duty (Stephanie) and Ms. Davies before submitting a report against Brandon for "trying to indirect[ly] bully" her. *Id.* Minutes later, Stephanie spoke with Brandon, and Plaintiff assumes that Stephanie told Brandon about the complaint despite her wishes to the contrary. *Id.* at 120:9–123:2.

On the other side, both Mr. Erwin and Ms. Harpel remember meeting with Plaintiff about this incident. Harpel Aff. ¶¶ 3–4, ECF No. 32-1; Erwin Aff. ¶ 2, ECF No. 32-2. However, when Mr. Erwin asked Plaintiff what the three associates were saying about her, she replied that she was not sure and did not provide any details. Erwin Aff. ¶ 2, ECF No. 32-2. As a result, Mr. Erwin instructed Ms. Davies to hold a team meeting to discourage associates from talking about others. *Id.* Plaintiff similarly refused to explain further to Ms. Harpel and simply told her that it was "irrelevant" and that she did not want to talk about it. Harpel Aff. ¶ 5, ECF No. 32-1. Given this lack of detail, Ms. Harpel did not believe it would be appropriate to invite Brandon to the meeting, considering that it may result in confrontation. *Id.* ¶ 7. Mr. Erwin and Ms. Harpel both aver that at no point during their meetings with Plaintiff did she ever claim that anyone had reportedly called her a "racist." *Id.* ¶ 8; Erwin Aff. ¶ 5, ECF No. 32-2.

## C. Plaintiff is injured, enters Honda's restricted work program, and continues to have poor attendance and complain about coworker interactions.

On December 5, 2022, Plaintiff suffered an injury to her left knee at work. Gresham Dep. 19:2–9, ECF No. 32-5; ECF No. 32-9. Plaintiff was sent to Honda's plant physician, who opined that Plaintiff had probably just "pulled something" and refused to approve her for an MRI.[6] Gresham Dep. 21:21–22:12,

---

[6] Although Plaintiff testified that the Honda medical team told her that she had likely just pulled a muscle, the only usage of that term in the record is on a form that Plaintiff herself filled out, within a section asking for a narrative description of what had harmed her. *See* ECF No. 32-8 at PAGEID # 524. Additionally, the record indicates that

ECF No. 32-5. So, Plaintiff worked with an injured knee for several weeks before she went to the emergency room for an x-ray examination.[7] *Id.* She found a private physician and was subsequently scheduled for surgery in February 2023. Gresham Dep. 22:13–14, ECF No. 32-5; ECF No. 32-9 at PAGEID # 529.

Meanwhile, Honda assigned Plaintiff to a position in a different department (the paint department) that met her medical restrictions through its Transitional Work Assignment ("TWA") program. Gresham Dep. 160:3–7, ECF No. 32-5; ECF No. 32-9 at PAGEID # 528. The TWA program "is designed to provide temporary, not permanent, accommodation for associate[s] with conditions currently preventing them from performing their normal work assignment, but improvement is expected." ECF No. 32-9 at PAGEID # 528. Program length "is determined on a case by case basis," and if an employee takes a leave of absence during their TWA, that same assignment "may not be available" upon their return to work. *Id.* Similarly, a TWA could end if, *inter alia*, an employee is assigned to another TWA position, placed off work, or assigned to another work recovery program. *Id.*; *see also* Gresham Dep. 161:13–162:24, ECF No. 32-5.

On Plaintiff's first day in the paint department, Plaintiff overheard an African American coworker named Shawna gossip to another employee about

---

Plaintiff "denied further needs and returned to work" after meeting with the Honda physician. ECF No. 32-9 at PAGEID # 527.

[7] Contrary to Plaintiff's testimony, the Honda injury report and associate statement of incident both reflect that Plaintiff went to the emergency room sometime before December 14, 2022. ECF No. 32-8 at PAGEID ## 523, 525.

Plaintiff, saying that Plaintiff could not be trusted, was racist and prejudiced, and did not like white people.  Gresham Dep. 140:16–141:4, 142:20–143:9, ECF No. 32-5.  Plaintiff testified that she filed a written report of the incident with Honda Human Resources ("HR") and attached a recording.  *Id.* at 141:5–24.  For its part, Honda represents that it has no record of this complaint or the recording.  ECF No. 36 at PAGEID ## 673–74.

Shortly thereafter, Plaintiff requested to take medical leave.  Gresham Dep. 144:2–6, 163:11–19, ECF No. 32-5; ECF No. 32-9 at PAGEID # 529.  Plaintiff had surgery for a tear in her meniscus in early February 2023.  Gresham Dep. 22:15–23:5, ECF No. 32-5; ECF No. 32-9 at PAGEID # 530.  On February 21, 2023, Plaintiff texted the Honda medical team that she was ready to return to work.  ECF No. 32-9 at PAGEID # 531.  Her private physician authorized her to return to work "doing sit down work only at this time."  *Id.* at PAGEID # 532.  Although there were no sit-down TWA positions available at that time, the Honda medical team advised Plaintiff that the availability of assignments "can change daily."  *Id.* at PAGEID # 531.  Indeed, when Plaintiff returned to work on February 27, 2023, she was assigned to a sit-down position that involved sorting parts for door assembly.  *Id.* at PAGEID ## 534–35; Gresham Dep. 166:2–167:21, ECF No. 32-5.

Plaintiff's sorting assignment was to end on March 6, 2023, but Honda extended the end date to March 20, following a letter from Plaintiff's physician that continued her sitting restrictions.  ECF No. 32-9 at PAGEID ## 535–36.  On

March 14, Plaintiff met with Honda's medical team about moving to a different program, called the Work Recovery ("WR") program. *Id.* at PAGEID # 537. The WR program is "an on-site return to work program" that encourages employees "to perform modified or alternative work, which is within their current functional abilities, while they recover." *Id.* at PAGEID # 538. After working with Plaintiff's physician, Honda advised Plaintiff that her placement in the WR program "would be based on therapy recommendations and manpower needs." *Id.* at PAGEID # 540. Ultimately, though, Honda's physical therapist evaluated Plaintiff and found that she was not ready to participate in the WR program "due to pain, significant strength deficits . . . and impaired gait and functional activities." *Id.* at PAGEID # 541; Gresham Dep. 172:2–12, ECF No. 32-5.

Plaintiff was frustrated that she failed to qualify for the WR program. ECF No. 32-9 at PAGEID # 542. So, in early April 2023, she asked her private physician to "write her off work" (i.e., recommend that she take medical leave). *Id.* at PAGEID # 543; Gresham Dep. 173:23–174:3, ECF No. 32-5. Plaintiff's physician declined to do so and instead released her to "return to work full duty" with no restrictions. ECF No. 32-9 at PAGEID ## 544–45, 548. Consequently, Honda placed Plaintiff in a position on an assembly line. *Id.* at PAGEID # 549. But Plaintiff was "unhappy with the decision regarding placement and stated it was unfair." *Id.*; *see also* Gresham Dep. 176:3–10, ECF No. 32-5 ("It's a line where you have to crawl. They wanted me to crawl inside a frame, and that was where I should not have been doing [sic].").

While this was going on, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission on March 31, 2023. ECF No. 1-1. Therein, Plaintiff claimed that she was discriminated against because of her race,[8] that she "was subjected to different terms and conditions of employment, including, but not limited to, false accusations and rumors," and that she had "complained multiple times to [Honda], to no avail." *Id.* at PAGEID # 7. She also noted that she "returned from medical leave" but that Honda did not allow her to "return to [her] position." *Id.*

Between April 2023 and December 2023 (when Plaintiff filed the instant action), Plaintiff continued to rotate between extended periods of medical leave and working with restrictions. Gresham Dep. 177:8–20, ECF No. 32-5. Honda placed Plaintiff in several different positions during this time to comply with her restrictions. *Id.* at 19:21–20:1, 157:1–8, 180:19–181:20 ("I was moved around several times."). Additionally, Plaintiff's attendance continued to suffer during those periods she was working, causing Honda to issue Plaintiff an Attendance Improvement Plan ("AIP") on June 7, 2023. ECF No. 32-15 at PAGEID # 601. Plaintiff's attendance rate as of that date was 90.23%. *Id.* The AIP warned that this was Plaintiff's "final opportunity to correct [her] attendance issues" and that "failure to comply . . . may result in separation of employment." *Id.*

---

[8] Plaintiff also asserted age discrimination, disability discrimination, and retaliation in her charge of discrimination, but she only asserts race-based claims in her Complaint. *Compare* ECF No. 1-1 at PAGEID # 8 *with* Compl., ECF No. 1.

Plaintiff also reported to Honda management at least four separate incidents involving interactions with her coworkers during the period between April and December 2023.  First, Plaintiff complained that another African American associate named Velvet pushed Plaintiff's leg out of the way to reach a file cabinet and told other associates that Plaintiff was racist.  Gresham Dep. 130:10–131:20, 133:9–134:17, ECF No. 32-5; ECF No. 35-1 at PAGEID # 623; ECF No. 32-11 at PAGEID # 551 ("[Plaintiff] also reported there being a clique in the area, whose leader was an associate named Velvet, and Velvet has told people that [Plaintiff] is racist against white people and is generally mean.").  Plaintiff reported this incident—which occurred on Plaintiff's first day in a new department—to Honda HR, including Simon Lumby, an HR Operations Specialist.  ECF No. 32-11 at PAGEID # 551; Lumby Aff. ¶¶ 1, 3, ECF No. 32-3.  Honda HR investigated Plaintiff's complaint but found that her allegations were not substantiated.  Lumby Aff. ¶ 5, ECF No. 32-3; ECF No. 32-11 at PAGEID ## 554–58.

Second, Plaintiff reported that two white associates, Kristi Turner and Dakota Shankes-Downing, had placed the wrong part on a vehicle and blamed Plaintiff to sabotage her.  ECF No. 32-11 at PAGEID # 551.  Honda HR investigated these complaints, and the investigation revealed that Kristi had accidentally placed the wrong part on the line, for which Kristi took responsibility.  *Id.* at PAGEID # 563.  Plaintiff also reported that Dakota had stepped on

Plaintiff's foot on purpose, *id.* at PAGEID # 551, but Honda HR was not able to substantiate Plaintiff's allegations, *see, e.g.*, *id.* at PAGEID # 563.

Third, Plaintiff complained again about Dakota a few months later, in September 2023.  ECF No. 32-12.  Plaintiff claimed that Dakota was creating a "hostile work environment" by "intentionally walking in front of her" and by lying about Plaintiff not shutting her line down.[9]  *Id.*  Because it was common for associates to migrate into each other's areas while working on the line, though, Honda did not investigate Plaintiff's complaint.  Lumby Aff. ¶ 6, ECF No. 32-3; Mayes Aff. ¶ 3, ECF No. 32-4.

Finally, in October 2023, Plaintiff filed a complaint with Honda C&E, asserting that another associate named Mustafa Alassawi (who is Middle Eastern) told someone that Plaintiff was a racist and prejudiced.  Gresham Dep. 145:21–146:12, ECF No. 32-5; ECF No. 35-1 at PAGEID # 623; Mayes Aff. ¶ 4, ECF No. 32-4.  Honda investigated the complaint and spoke to Mustafa.  Mayes Aff. ¶ 6.  Because Mustafa denied calling Plaintiff a racist, Honda was unable to substantiate Plaintiff's complaint.  *Id.* ¶ 7.

As far as the Court is aware, Plaintiff is still employed at Honda.  Since being placed on her AIP in June 2023, however, Plaintiff has had around six unexcused absences in violation thereof.  Gresham Dep. 199:19–200:6, ECF No.

---

[9] Plaintiff testified during her deposition that she had also heard Dakota tell others that Plaintiff is racist, but Plaintiff confirmed that she never reported this to Honda HR. Gresham Dep. 291:12–294:18, ECF No. 32-5.

32-5. And as of the date of Plaintiff's deposition (June 2025), she had not yet been released by her medical providers to perform her regular duties at Honda without restrictions. *Id.* at 47:17–20. Plaintiff's current physicians have advised her that she likely will never be able to continue in the same line of work (at Honda or elsewhere) without permanent functional restrictions and that she should look for a different job.[10] *Id.* at 48:17–49:10.

---

[10] The parties' summary judgment briefing also focuses on factual events occurring *after* Plaintiff commenced this lawsuit in December 2023. *See* Compl., ECF No. 1. The parties discuss, for example, an incident in January 2024 that involved Plaintiff hitting another associate with a cart and an incident in November 2024 that involved Plaintiff complaining to Honda HR that an Asian employee was not training her correctly. *See* ECF No. 32 at PAGEID ## 87–88; ECF No. 35 at PAGEID ## 610–11, 615–16.

But these post-Complaint facts cannot support either party on summary judgment because "[t]he filing of an action fixes the controversy." *Rodgers v. Hawley*, 14 F. App'x 403, 408 (6th Cir. 2001). Thus, when a plaintiff files a complaint, she cannot later "rely on evidence of an event that occurred after [s]he filed [her] claim as support for that claim" when faced with a motion for summary judgment. *Id.*; *see also Blick v. Ann Arbor Public School Dist.*, 105 F.4th 868, 876 (6th Cir. 2024) ("The filing of the operative complaint 'fixes the controversy' as of that date, and federal courts will not consider post-complaint factual developments." (citation omitted)). Instead, if a plaintiff "desire[s] to litigate events occurring after [s]he filed [her] . . . claim, [the plaintiff] need[s] to file a supplemental pleading under" Federal Rule of Civil Procedure 15(d). *Rodgers*, 14 F. App'x at 408; *see also, e.g., El-Khali v. Usen*, No. 21-1140, 2021 WL 4621828, at *4 (6th Cir. Oct. 7, 2021) ("In the absence of a supplemental pleading under Fed. R. Civ. P 15(d), El-Khalil cannot predicate his allegations on events occurring after the [first amended complaint].").

Because Plaintiff did not file such a supplemental pleading in this case, the post-Complaint events referenced above are not properly part of this action, and the Court will not consider them on summary judgment. *See El-Khali*, 2021 WL 4621828, at *4 ("[The plaintiff's] failure to file a supplemental pleading leads us to conclude that those events that occurred after he filed the [first amended complaint] are not properly part of this action. While it is true . . . that the district court should consider all record evidence, that does not extend to acts that occurred after the [first amended complaint] and were never made part of the allegations for relief." (citations omitted)).

## II.    PROCEDURAL HISTORY

In September 2023, the EEOC sent Plaintiff notice of her right to sue.  ECF No. 1-2.  Plaintiff timely instituted this case and filed her Complaint against Defendant in December 2023.  *See* Compl., ECF No. 1.  She alleges two claims therein: (1) racial harassment and discrimination, in violation of Title VII of the Civil Rights Act of 1964; and (2) racial harassment and discrimination, in violation of 42 U.S.C. § 1981.  *Id.* at ¶¶ 10–23.  Plaintiff seeks relief in the form of "instatement to a proper position," back and front pay and benefits, compensatory and punitive damages for emotional distress, attorneys' fees, costs, and interest.  *Id.* at PAGEID # 6.

## III.    STANDARD OF REVIEW

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a): "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The Court must grant summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and "on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine dispute of material fact for trial, and the Court must refrain from making credibility

determinations or weighing the evidence. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 255 (1986). The Court disregards "all evidence favorable to the moving party that the jury would not be required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citation omitted). Summary judgment will "not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (internal quotation marks and citation omitted).

The Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). The Court may rely on the parties to call attention to the specific portions of the record that demonstrate a genuine issue of material fact. *Wells Fargo Bank, N.A. v. LaSalle Bank N.A.*, 643 F. Supp. 2d 1014, 1022 (S.D. Ohio 2009).

## IV. ANALYSIS

At bottom, Plaintiff alleges that she was the victim of a pattern of racial harassment and discrimination perpetuated by her employer, Honda. ECF No. 35 at PAGEID # 608. Plaintiff asserts that her coworkers discriminated against her based on her race by spreading false accusations and rumors that she was racist and prejudiced and that Honda did nothing to stop it. Gresham Dep. 50:3–11, 61:15–24, 238:8–18, ECF No. 32-5. Plaintiff maintains that she was unable

to be promoted at Honda as a result. *Id.* at 183:10–19. In addition, Plaintiff contends that Honda management continuously moved her around between various positions and departments instead of assigning her a permanent job, placed her in positions that she could not handle, and denied her training or instructed a minority associate (as opposed to a white associate) to train her. *Id.* at 153:24–154:16; ECF No. 35 at PAGEID ## 615, 618. Plaintiff contends that Honda's conduct—namely, fostering racially based harassment and treating Plaintiff differently in training and job placement—amounts to intentional discrimination on the basis of her race and has resulted in a hostile work environment. ECF No. 35 at PAGEID ## 618–19.

The Court begins with Plaintiff's allegations of disparate treatment before turning to her hostile work environment allegations. Ultimately, neither are successful.

## A. Disparate Treatment

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). Section 1981 also prohibits employment discrimination, stating, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Courts use the same standards to evaluate race discrimination claims under both Title VII

and Section 1981. *Johnson v. Bender Mgmt., LLC*, No. 25-1374, 2025 WL 2742524, at \*2 (6th Cir. Sept. 26, 2025) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)). The Court will thus conduct a single analysis of Plaintiff's two discrimination claims. *See, e.g., Goggins v. ALM Printers, LLC*, No. 3:24-CV-00321, 2026 WL 66981, at \*6 (M.D. Tenn. Jan. 8, 2026).

At the summary judgment stage, "a plaintiff must adduce either direct or circumstantial evidence [of discrimination] to prevail on a Title VII [or Section 1981] race-discrimination claim." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009)). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). In this case, Plaintiff does not put forth direct evidence of race discrimination.

Where, as here, a plaintiff offers only circumstantial or indirect evidence of racial discrimination, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.[11] *Rogers*, 897 F.3d at

---

[11] Plaintiff urges the Court to reject *McDonnell Douglas* as "the only means of establishing a prima facie case" and instead consider "the mosaic of circumstantial evidence." ECF No. 35 at PAGEID ## 618–19. She points to a case in which the Eleventh Circuit held that "[a] plaintiff who cannot satisfy [the *McDonnell Douglas*] framework may still be able to prove her case with . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination[.]" *Tynes v. Florida Dep't of Juvenile Justice*, 88 F.4th 939, 946 (11th Cir. 2023) (internal quotation marks and citation omitted); *see also Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994) (considering "pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff").

771 (citation omitted).  Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Id.* at 772 (citing *Upshaw*, 576 F.3d at 584); *see also Int'l Bhd. of Teamsters*, 431 U.S. at 358 ("The importance of *McDonnell Douglas* lies . . . in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion[.]").  Then, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision." *Rogers*, 897 F.3d at 771 (citing *Upshaw*, 576 F.3d at 584).  If the employer does so, "the

It does not appear, however, that the Sixth Circuit utilizes this "convincing mosaic" framework.  *Cf. Kuklinski v. Mnuchin*, 829 F. App'x 78, 82 (6th Cir. 2020) (analyzing Title VII retaliation claim under *McDonnell Douglas* despite plaintiff's argument that district court erred by not considering "mosaic of retaliation evidence").  Moreover, the Seventh Circuit, which first developed the convincing mosaic framework, has since opined that "[i]nstead of simplifying analysis, the 'mosaic' metaphor has produced a form of legal kudzu." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  The correct standard, the Seventh Circuit recognized, "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action," and "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 765–66.  And "[t]hat conclusion is consistent with *McDonnell Douglas*[.]" *Id.*

Plaintiff also cites to *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 358 (1977), in which the Supreme Court noted that *McDonnell Douglas* is not the only means of establishing a *prima facie* case of discrimination.  But that case is distinguishable.  In *Teamsters*, the plaintiff brought a "pattern-or-practice" case and alleged a systemwide policy of discrimination. *Id.* at 357–58.  This is a specific theory of Title VII liability that requires a different *prima facie* showing than that contemplated by *McDonnell Douglas. Id.* Although Plaintiff alleges a "continuing pattern of harassment" against her, *see* Compl. ¶¶ 15, 22, ECF No. 1, she does not argue, for instance, that discrimination was Honda's standard operating procedure, nor has Plaintiff offered evidence of such a procedure or company-wide policy.

With these points in mind, the Court will not abandon the *McDonnell Douglas* framework as Plaintiff suggests.

plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual." *Id.* (citing *Upshaw*, 576 F.3d at 584).

Plaintiff alleges that Honda discriminated against her by (1) failing to promote her; and (2) denying her adequate training and moving her between different positions (some of which she could not handle). The *prima facie* showings for these categories differ slightly, so the Court begins with Plaintiff's failure-to-promote theory.

### 1.    Failure to Promote

To establish a *prima facie* case of racial discrimination based upon a failure to promote, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time her request for promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000).

Here, no one disputes that Plaintiff is a member of a protected class. Her claim nevertheless fails because she cannot establish the other three elements. Most problematically, Plaintiff never applied for a promotion at Honda. Gresham Dep. 70:6–10, 183:20–184:9, ECF No. 32-5. Because she never applied for a promotion, Honda never considered her for or denied her the same.

Plaintiff's argument to the contrary is unavailing. Plaintiff acknowledges that her discipline for poor attendance prevented her from being eligible for a

promotion, but she challenges the accuracy of Honda's attendance records, presumably to show that she did, in fact, qualify for a promotion. ECF No. 35 at PAGEID # 619. But Plaintiff's admissions during her deposition belie this argument. *See, e.g.*, Gresham Dep. 191:18–192:2, ECF No. 32-5 ("Q. . . . [Y]ou were disciplined at your level 1 in March of 2021, you got your level 2 in February of 2022, and then level 3 in September of 2022, and you just went through those *and agreed with those*, right? A. Yes." (emphasis added)). Other than her subjective belief, Plaintiff has not offered any evidence to create a genuine issue of material fact about the accuracy of Honda's records.

In any event, even assuming Plaintiff would have qualified for a promotion, she never sought one, which means that her claim of race discrimination on a failure-to-promote theory cannot succeed.[12] *See, e.g.*, *Hall v. Michigan State Police Dep't*, 290 F. App'x 913, 918 (6th Cir. 2008) ("This failure to apply means that Hall was unable to establish the second element of his prima facie case.").

Therefore, Honda is entitled to summary judgment on this theory of Plaintiff's race discrimination claims.

---

[12] The Sixth Circuit has previously recognized an exception to the general rule that an individual must apply for a position before she can bring a failure-to-promote claim. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000). However, that exception exists only when "the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion." *Id.* That was not the case here.

### 2. Training and Job Placement

Plaintiff also takes aim at Honda's failure to place her in a permanent position and afford her adequate training.  To succeed under this theory of liability, Plaintiff must show that she was (1) a member of a protected class; (2) qualified for her position; (3) subject to an adverse employment action; and (4) replaced by a person outside of her protected class or treated differently than similarly situated non-minority employees.  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

Again, it is clear that Plaintiff has met the first element by virtue of her status as an African American woman.  But, as with her failure-to-promote theory, Plaintiff has not offered sufficient evidence as to the remaining elements, so her claim fails.

At the outset, Plaintiff does not offer evidence to raise a genuine issue of material fact about whether she was denied training or whether she was placed in positions that she could not handle.  Plaintiff points to only one specific instance of being denied training, and that occurred in late 2024—after Plaintiff commenced this case.[13]  *See* Gresham Dep. 224:8–226:14, ECF No. 32-5; *see supra* Section I.C. n.10.  Indeed, Plaintiff admits that she kept "getting trained in

---

[13] In any event, Plaintiff admitted in her deposition that she *did* receive training at this time and agreed that her issue was actually that the training was going too slowly. Gresham Dep. 227:5–21, ECF No. 32-5.

Case No. 2:23-cv-4015                                          Page 21 of 29

different areas." ECF No. 35-2 at PAGEID # 648. Thus, no facts support that Plaintiff was denied training at all during the relevant time, let alone that she was denied training due to her race.

Moreover, Plaintiff presents three examples of positions in which she was placed that she could not handle, two of which occurred before she filed her Complaint: a position installing bumper beams and a position on an assembly line that required crawling. Gresham Dep. 175:24–176:10, 213:22–216:7, ECF No. 32-5. As to the former, Plaintiff testified only that installing bumper beams was a "heavy process"—not that it was against any medical restrictions or otherwise too difficult for Plaintiff to complete. *Id.* at 216:3–7. As to the latter, Honda assigned Plaintiff to the assembly line immediately after her physician released her to work without restrictions. ECF No. 32-9 at PAGEID ## 544–45, 548–49; Gresham Dep. 176:22–177:7, ECF No. 32-5. Plaintiff offers no evidence that Honda placed her in either of these positions because of her race, and her subjective belief that she should not be crawling or engaging in a "heavy process" because of her knee injury is insufficient to create an issue of fact preventing summary judgment on her race discrimination claim.

Nor has Plaintiff shown that occupying temporary positions in different departments or being trained by minority employees constitute adverse employment actions. An employee challenging a transfer under Title VII (or Section 1981) must show that the transfer left her "worse off." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 359 (2024). Courts find that transfers to

Case No. 2:23-cv-4015                                                Page 22 of 29

positions at a more difficult job site, positions involving nighttime work, and positions with changes in supervising duties or overtime pay opportunities are harms that suffice to show an adverse action. *See id.* at 975; *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 787 (6th Cir. 2024). In this case, Plaintiff does not explain how frequently moving positions left her "worse off." That is not surprising, given that she did not experience a loss of pay or change in work hours, and her positions were light-duty roles that accommodated her medical restrictions. *Cf.* Gresham Dep. 27:11–20, ECF No. 32-5 ("Q. . . . Whenever you would return back to work from your doctor, [Honda] then [tried] to find a program that meets your restrictions, find a process for you . . . right? A. Yes."). She was also aware that position changes could occur, by virtue of her participation in the TWA program. *See* ECF No. 32-9 at PAGEID # 528; *see also* Gresham Dep. 19:13–20, ECF No. 35-2 ("Q. . . . [I]t's not unusual, would you agree, for Honda associates to be cross-trained and trained to do other processes and move around within their department, right? A. Yes, it's not unusual."); *id.* at 23:13–17 ("Q. When you are on restrictions and working with Honda medical, you aren't assigned a department. That's normal, right? A. When I was on restrictions, correct."). Simply because Plaintiff was not transferred to "the area of [her] choice" does not mean that she was worse off. ECF No. 35-3 at PAGEID # 658. The same goes for Plaintiff's allegations that she was trained only by minority employees—nowhere does Plaintiff argue that this left her in a worse position than if she were trained by white employees.

Finally, if this were not enough, Plaintiff has not supplied evidence that she was treated differently than her similarly situated coworkers, as required by the fourth prong of the *prima facie* case. Plaintiff argues that she was disparately treated during an incident that occurred in 2024, *see* ECF No. 35 at PAGEID # 618, but again, that was after she filed this case, *see supra* Section I.C. n.10. And Plaintiff points to Brandon, a white employee, *see* ECF No. 35 at PAGEID # 618, but she does not set forth any facts or argument as to how he is similarly situated to her (besides his status as a Honda associate). Otherwise, Plaintiff offers no other comparators whom Honda treated differently or better. Without any comparators, Plaintiff's race discrimination claim "can't get off the ground." *Wargo v. MJR Partridge Creek Digital Cinema 14*, No. 25-1143, 2025 WL 3285639, at *5 (6th Cir. Nov. 25, 2025).

Honda is accordingly entitled to summary judgment on Plaintiff's race discrimination claim based on these theories of liability.

## B. Hostile Work Environment

Along with claims of disparate treatment, a hostile work environment claim based on workplace harassment is also actionable under both Title VII and Section 1981. *See, e.g., Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (Section 1981); *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008) (Title VII). In this case, Plaintiff claims that her coworkers harassed her because of her race and that Honda failed to adequately redress the harassment, which created a hostile work environment. ECF No. 35 at PAGEID # 619.

"A hostile work environment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment[.]" *Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171, at *7 (6th Cir. July 16, 2024) (internal quotation marks and citation omitted).  To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) she belonged to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the defendant knew or should have known about the harassment and failed to act.  *Williams*, 643 F.3d at 511.  The harassment must meet both an objective and a subjective test—"in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir.2006).

Plaintiff has satisfied the first two elements—she is a member of a protected group, and she was subjected to harassment in the form of the comments and rumors that her coworkers spread.  Plaintiff's case falls apart, however, when the Court looks to the third element.

A plaintiff may show that unwelcome harassment was based on race by adducing direct evidence of the use of race-specific and derogatory terms or comparative evidence of how the alleged harassers treated members of both

races in a mixed-race workplace. *See Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375, 383 (6th Cir. 2025) (citation omitted). Plaintiff points to direct evidence—namely, terms used by her coworkers like "racist" and "prejudiced"—and comparative evidence—namely, the unfavorable employment-related actions to which she was subjected that the Court discussed above. *See supra* Sections A.1., A.2. Neither of these avenues are fruitful.

First, harassing someone for being a racist is not harassment "based on" their race. *See, e.g., Byrnes v. City of Hattiesburg*, 662 F. App'x 288, 291 (5th Cir. 2016) ("Harassing someone because he is a racist (or the son of one) is not the same as harassing someone because of his race . . . . Byrnes failed to show that the alleged harassment based on racism had anything to do with Byrnes's race."). As Plaintiff admits, a person of any race can be racist. *See* Gresham Dep. 52:22–54:5, ECF No. 32-5 ("Q. So my question to you is calling someone a racist, that isn't saying you're racist because you're white or you're racist because you're black. It's saying you're racist because there's a belief that that person who's being called that term holds a view that is believed to be negative towards other races. Is that correct? A. Yes."); *see, e.g., Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-CV-00491, 2022 WL 1283087, at *16 (M.D. Tenn. Apr. 28, 2022) ("[C]olor discrimination can occur between persons of different races or ethnicities, or between persons of the same race or ethnicity." (citation omitted)). Notwithstanding this point, Plaintiff maintains that her coworkers' conduct "targeted her," an African American, as "being prejudiced and not liking

white people," such that "[t]he rumors, then, were based on race[.]" ECF No. 35 at PAGEID # 620. Merely observing that Plaintiff is African American, however, is not enough to make the connection necessary for a claim of race-based harassment. *See, e.g.*, *Marshall v. Wayne Cnty., Michigan*, No. 22-1499, 2023 WL 2707222, at *3 (6th Cir. Mar. 30, 2023) ("[T]he mere fact that Marshall is African American and someone pulled a prank on him isn't enough to raise an inference of racial animus."); *Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009) (explaining that something undesirable happening to a member of a protected class, without more, does not give rise to an inference that it happened *because* he was a member of a protected class).

Furthermore, conduct that is merely based on personal animus or jealousy does not constitute harassment "based on race." *See, e.g.*, *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 300 (6th Cir. 2015) (affirming summary judgment where plaintiff failed to show that alleged harassment was based on race rather than personality conflicts). In this case, Plaintiff herself argues that her coworkers were calling her racist and prejudiced because they were "jealous of [her] work productivity." Gresham Dep. 50:12–17, ECF No. 32-5; *see also, e.g.*, *id.* at 56:10–23 ("And when I started to get a lot of attention from management to where I believe I was going to get a promotion, the team members got jealous. And I remember those three guys started this nasty rumor."); *id.* at 64:4–8 (Q. Okay. And, again, you state in your own complaint here that you believe the main reason [for] this is out of jealousy, correct, for your

high productivity? A. Yes."); Compl. ¶ 8, ECF No. 1 ("Plaintiff says that these rumors were chiefly propagated by two co-workers who were jealous of Plaintiff's high productivity."). This completely undermines Plaintiff's argument that the comments were made because of her race.

Second, as to comparative evidence, Plaintiff asserts that the comments and rumors that she was a racist, *combined with* her lack of proper training, movement between positions, and placement in positions she could not handle, created a hostile work environment. ECF No. 35 at PAGEID # 619. It is true that the Court can consider "discrete, separately actionable adverse employment actions as evidence contributing to a hostile work environment." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 871 (6th Cir. 2025) (citation omitted). Plaintiff, however, fails to submit evidence creating a genuine issue of fact that non-African American individuals were not subjected to the harassment she alleges. Nor has she presented evidence that the challenged actions "would not have occurred *but for* the fact that [she] was African American." *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (citation omitted) (emphasis added).

Plaintiff accordingly has not established the third element of her *prima facie* case for her hostile work environment claim. Because she cannot meet her "initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion," *Int'l Bhd. of Teamsters*, 431 U.S. at 358, Honda is entitled summary judgment on this claim.

## V.    CONCLUSION

There is no evidence from which a reasonable juror could find that Honda

discriminated against Plaintiff because of her race.  So, Honda's motion for

summary judgment, ECF No. 32, is **GRANTED**.  The Clerk shall enter judgment

for Honda and terminate this case.

**IT IS SO ORDERED**.

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**